**In re JOHN CLAY AND COMPANY, INC., Debtor.**

**Bankruptcy No. 83A–01323.**

United States Bankruptcy Court, D. Utah.

June 15, 1984.

Steven R. Bailey, Ogden, Utah, trustee acting pro se.

Robert Clark, Salt Lake City, Utah, for Manterola, Arriaga, Wilaha, and Enchandi.

David C. West, Salt Lake City, Utah, for Auza.

J. Kent Holland, Salt Lake City, Utah, for Uhalde.

Gary F. Kennedy, Salt Lake City, Utah, for Aetna.

Robert Merrill and Thomas Berggren, Salt Lake City, Utah, for CSB.

## MEMORANDUM OPINION

GLEN E. CLARK, Bankruptcy Judge.

### CASE SUMMARY

Certain creditors in this case have moved the court to reconsider its Memorandum Opinion of January 23, 1984. The issue addressed in that opinion and again here is whether certain claims of sheep producers made against the debtor's estate constitute pre-petition debts deserving unsecured claim priority or whether they constitute post-petition debts deserving administrative expense priority. In its original decision, this court interpreted and applied the Packers and Stockyards Act, 1921, ("Packers Act") (7 U.S.C. § 181, et seq.). In their motions to reconsider, movants argue that they were not accorded due process of law because they did not receive ample and timely notice of, and therefore did not have sufficient opportunity to brief and fully litigate, the legal theory predicated upon the Packers Act.

### FACTS AND PROCEDURAL POSTURE

This dispute originates in the vast and arid stretches of Arizona's sheeplands. There John Clay & Co. ("debtor") has for over 20 years been engaged in the business of purchasing livestock on a commission basis from sheep producers and selling them to packers and stockyard dealers.

The debtor's Arizona agent and buyer was Raymond C. Williams.

Beginning on April 7, 1983, and continuing until May 19, 1983, the debtor, through Williams, purchased sheep from the sheep producers on the following list which also sets forth the delivery dates and the sales prices for each transaction relevant to this case:

| Sheep Producer | Date of Delivery | Sales Price |
|---|---|---|
| Frank Zubeldia | 5/2/83 | $ 2,399.95 |
| John Errea | 5/4/83 | 68,846.40 |
| Wilaha Sheep | 5/7/83 | 2,199.76 |
| Frank Zubeldia | 5/8/83 | 1,748.70 |
| Albert Urbeltz | 5/8/83 | 2,725.92 |
| Wilaha Sheep | 5/9/83 | 155,473.06 |
| Auza Brothers, Inc. | 5/11/83 | 62,582.80 |
| Manterola Sheep Co. | 5/11/83 | 39,228.64 |
| Wilaha Sheep | 5/11/83 | 5,325.80 |
| Manterola Sheep Co. | 5/13/83 | 85,037.96 |
| Long Tom Sheep | 5/15/83 | 15,850.00 |
| Tony Enchandi | 5/16/83 | 25,707.68 |
| Jean Arriaga | 5/16/83 | 62,643.56 |
| Auza Brothers, Inc. | 5/16/83 | 93,631.16 |
| Ernest Uhalde | 5/17/83 | 9,517.80 |
| Ernest Uhalde | 5/19/83 | 5,323.80 |
| Jean Arriaga | 5/19/83 | 24,334.30 |
| Auza Brothers, Inc. | 5/19/83 | 5,978.78 |
| Jean Arriaga | 5/19/83 | 2,181.55 |
| Tony Enchandi | 5/19/83 | 1,949.25 |
| Total | | $672,686.87 |

In each of the above transactions (except those involving Ernest Uhalde, which shall be addressed in the next paragraph), the debtor entered into an oral contract with the sheep producer approximately three weeks before the debtor obtained delivery of the sheep. In each transaction, the same general procedure was used to effect delivery of the livestock: Independently owned and operated trucks arrived at the sheep producer's place of business on a predetermined schedule. The sheep were then sorted, segregated into age groups, and loaded onto trucks which were driven to the weigh station. At the weigh station, the stock were weighed, weigh tickets and invoices were prepared, and the total dollar amount of each transaction was calculated. In most instances the debtor presented, at the weigh station, a draft, representing payment for the purchase, to each sheep producer. In a few instances, the debtor later mailed the draft to the seller. The drafts were drawn on the debtor's account with Commercial Security Bank ("CSB"), which, as a result of the debtor's filing of its petition under Chapter 11, subsequently dishonored them and returned them unpaid to the sheep producers.

With regard to the May 17 and 18 Uhalde transactions, the debtor contracted with that rancher approximately two days before obtaining delivery of the sheep on May 17, 1983. Delivery took place in the manner described above. But the procedure by which Uhalde was paid differed from the other transactions. Payment for the May 17 transaction was made, not by draft from the debtor, but directly from the ultimate buyer, John F. Griggs, in the form of a check for $9,517.80 (the exact amount of the purchase price) made payable to Ernest Uhalde and John Clay. Uhalde's May 19 transaction, however, was made in the same manner as all the other transactions listed above, i.e., by a draft from the debtor.

At present none of the sheep producers, including Ernest Uhalde, has been paid anything whatsoever for these sales. Approximately $500,000.00, representing the proceeds from these transactions, is being held by the bankruptcy trustee.

During the period when these transactions were being negotiated and finalized, the debtor, unbeknownst to any of these sheep producers, was preparing to file a bankruptcy petition. On May 11, 1983, while sheep were being delivered to the debtor in Arizona by Auza Brothers, Inc. ("Auza"), Wilaha Sheep Co. ("Wilaha"), and Manterola Sheep Co. ("Manterola"), the debtor filed its Chapter 11 petition in this the United States Bankruptcy Court for the District of Utah, in Salt Lake City. The filing occurred in Utah at 1:56 p.m., Mountain *Daylight* Time. In Arizona, where the citizens are less concerned with saving daylight, the time of filing was 12:56 p.m., Mountain *Standard* Time. This time differential is critical to the determination of which of the May 11 transactions occurred

pre-petition and which occurred post-petition.

On May 31, 1983, debtor's chapter 11 case was converted to a case under chapter 7.

Between June 9 and June 30, 1983, motions for determination, allowance, and authorization to pay administrative expenses were filed by Auza, Manterola, Jean Arriaga ("Arriaga"), and Antonio and Eva Enchandi ("Enchandi"). Objections to these motions were lodged by CSB and by Aetna Life & Casualty Insurance Co. ("Aetna").

On July 1, 1983, a hearing was held before this court on these motions and objections.[1] This hearing was ultimately continued to August 8, 1983, in order to allow for the filing of all claims similar to those made by the sheep growers present. However, in the interest of justice and for the convenience of those who had traveled to Salt Lake City from Arizona, the court allowed witnesses Auza and Manterola to be examined and cross-examined on the record.

On July 11, 1983, Wilaha filed its motion for determination and allowance and authorization to pay an administrative claim. This motion was objected to by Aetna.

On August 8, 1983, the hearing, continued from July 1, was reconvened.[2] Testifying were witnesses Raymond C. Williams, Ernest Uhalde, and Philipe Perez of Wilaha. The court then heard some arguments and asked counsel present to file, within 30 days, written briefs and other papers pertinent to the issues raised at the hearing. The court also ordered the drafts

to Uhalde to be deposited by the trustee into a separate account pending this court's final ruling on these motions.

On August 17, 1983, Uhalde responded to certain objections that pointed out his failure to formally file a motion for allowance of an administrative expense.

On September 8, 1983, the trustee sought an extension of time in which to file his written brief.[3]

On or about September 22, 1983, six briefs were filed, one by each of the following: (1) Uhalde; (2) Auza; (3) Manterola, Arriaga, Wilaha, and Enchandi, collectively, ("Manterola, et. al."); (4) CSB; (5) Aetna; and (6) the trustee. The first three of these briefs each contained full arguments on the applicability of the Packers Act. The latter three contained no such arguments, but asserted, instead, that the legal theories predicated upon that Act had not been properly noticed and were not properly before the court.

On September 29, 1983, Uhalde belatedly moved for a determination and allowance of his claim as an administrative expense (apparently to forestall objections to his failure to file a formal motion and to cure any defect in the record); and, on October 3, 1983, he also moved, presumably in the alternative, for a determination that the check written by Griggs to Uhalde and Clay as well as the drafts written by Clay to Uhalde be deemed not to constitute property of the bankruptcy estate. CSB objected to these motions.

On October 11, 1983, CSB further moved this court to strike out the arguments of

---

1. Appearing at this hearing were Steven R. Bailey of Ogden, Utah, trustee acting *pro se;* Robert Merrill of Van Cott, Bagley, Cornwall & McCarthy of Salt Lake City, Utah, attorneys for CSB; Gary F. Kennedy of Suitter, Axland, Armstrong & Hanson of Salt Lake City, attorneys for Aetna; David C. West of Armstrong, Rawlings & West of Salt Lake City, attorneys for Auza and for Raymond C. Williams; William D. Baker of Ellis & Baker of Phoenix, Arizona, attorneys (*pro hac vice*) for Manterola, Arriaga, and Enchandi.

2. Appearing were Steven R. Bailey, trustee acting *pro se;* J. Kent Holland of Salt Lake City,

attorney for Ernest Uhalde; Noel S. Hyde of Nielsen & Senior of Salt Lake City, attorneys for Neil Jorgensen; David Gladwell of Thatcher & Glasmann, of Ogden, Utah, attorneys for the debtor John Clay & Co.; Gary F. Kennedy for Aetna; Danny C. Kelly, Thomas Berggren, and Jerald Engstrom for CSB; and David C. West for Auza.

3. The trustee claimed he needed the extra time to allow the Packers and Stockyards Division of the United States Department of Agriculture to submit a brief on the applicability of the Packers and Stockyard Act, 1921, to the issues raised in this case.

Auza and Manterola, et. al., on the Packers Act theory. On October 24, Auza responded to this objection. On November 15, the trustee also filed a motion to strike these same arguments.

With a fulsome record before it, this court, with due consideration to the evidence and the arguments of counsel, wrote, signed and entered its Memorandum Opinion of January 23, 1984, in which it found that the Packers and Stockyards Act, 1921, applied to the issues raised in this case and concluded that the debtor was a "market agent" within the meaning of that Act and that, while the debtor may hold legal title to the proceeds of the above listed transactions with sheep producers, nevertheless, the beneficial interest to these proceeds belonged to the sheep producers and did not constitute the property of the debtor's estate. The court made no separate disposition of Uhalde's claims.

A "judgment" was then prepared for the signature of the court by Robert S. Porter, attorney for Manterola, et. al.

Shortly after this, the court was deluged by objections and motions to reconsider the "judgment."

On February 22, 1984, yet another hearing was held [4] at which Uhalde argued that the court's opinion failed to address or dispose of the issues raised by him. CSB, Aetna and the trustee attacked the opinion because it was grounded on a legal theory, predicated on the Packers and Stockyards Act, which they alleged had not been properly noticed or sufficiently briefed or argued.

The court took these motions under advisement and now renders its final determination on the issues raised in these proceedings to date.

## ISSUES

There are two major issues before the court:

(1) The due process issue, which involves two questions:

(a) Whether or not due process of law has been accorded to the parties such that they received timely and ample notice of, and therefore sufficient opportunity to brief and argue, the legal theory, predicated upon the Packers and Stockyards Act, 1921, upon which this court based its earlier opinion in this case; and

(b) Whether or not the form of the "judgment," prepared for the court's signature and based upon its January 23 Memorandum Opinion, is proper; and

(2) The priority of claims issue, which also involves two questions:

(a) Whether the claims of the various sheep producers listed above should be given administrative expense priority or the priority of unsecured claims, a question that turns upon whether these claims are predicated on pre- or post-petition debts; and

(b) Whether or not any of these claimants are entitled to interest on their claims.

## ARGUMENTS

Inasmuch as this matter has again come before the court on certain parties' motions to reconsider, a full recitation of the arguments raised by the movants and respondents seems appropriate so that all parties may be fully apprised of precisely what the court has reconsidered in reaching this opinion.

*With regard to the due process issue, the parties argued as follows:*

*CSB* contends that (1) the applicability of the Packers and Stockyards Act, 1921 is not properly before the court; (2) that the arguments based on that Act were made without proper notice, upon insufficient relevant evidence, in the absence of legal memoranda; (3) that the Packers Act raises difficult questions regarding two distinct "trust funds" created by that act and which the court confused in its Memoran-

---

**4.** Appearing were Steven R. Bailey, trustee acting *pro se;* Robert Clarke, for Manterola, Arriaga, Wilaha, and Enchandi; David C. West for Auza; J. Kent Holland for Uhalde; Gary F. Kennedy for Aetna; and Robert Merrill and Thomas Berggren for CSB.

dum Opinion of January 23; (4) that John Clay had a dealer's license and was a "dealer" and not a "market agent" within the meaning of the Act; (5) that only the Packers Act § 196 packer "trust fund" is mentioned in the legislative history of § 541 of the Bankruptcy Code and that this "trust fund" does not apply because debtor is not a "packer" nor a "market agent", but a "dealer" under that Act; (6) that the opinion letter from the Administrator of the Packers Act is not properly before the court; and (7) that the court's opinion constitutes an unconsidered decision on an issue that, arising later, may occasion a different result.

*The trustee* asserts as further arguments (1) that the only issue before the court is the question raised by Auza, Arriaga, and Manterola, et. al. in their motions for determination, allowance and authorization for payment of administrative expenses; (2) that the hearing of July 1, 1983 was continued to August 8, 1983 for the sole purpose of allowing claimants to assert additional claims; (3) that Auza and Manterola have failed to file an adversary proceeding in order to determine the applicability of the Packers Act to this case; (4) that the trustee was not made a party to these proceedings as should have been done, and that the Packers Act arguments are inconsistent with the administrative expense arguments.

*Aetna* puts forth some of these same arguments and adds further that the attempt of the sheep producers to obtain the protection of the Packers Act is improvident because they failed to assert a timely motion, noticed to all creditors, of their intention to move forward on this legal theory.

*Manterola, et. al.* argues that the Packers Act issue is properly before the court because (1) it was raised in the proof of claims filed by Manterola, Arriaga, Wilaha, and Enchandi; (2) it was raised at the August 8, 1983 hearing in an off-the-record conference held by all the attorneys present; and that (3) pursuant to this conference, testimony was elicited from Ray-

mond C. Williams at the August 8 hearing on the Packers Act issues; (4) the court also asked questions eliciting evidence on those issues; (5) no party requested a continuance in spite of the evidence taken and the statement of intent by Robert S. Porter that he would proceed on the Packers Act issues; (6) the court asked for simultaneously submitted briefs within 30 days on all issues; (7) on September 8, 1983, the trustee made an *ex parte* motion claiming to need more time to research the Packers Act; (8) the trustee held telephonic interviews with Frank Rynes (debtor's bookkeeper) and Eric Paul, in-house counsel for the Packers and Stockyards Administration; (9) on September 16, 1983, B.H. Jones, Administrator of the U.S. Department of Agriculture under the Packers Act, mailed an opinion letter to all parties setting forth his opinion of the applicability of the Packers Act to this case; (10) after all this, trustee filed his brief claiming that the Packers Act was not properly before the court because it had not been timely noticed; (11) CSB and trustee did not follow up on their objections to the introduction of these issues into the case, nor did they file briefs in opposition to the position taken by Auza and Manterola, et. al. in their briefs. Manterola, et. al. also argue that they should be allowed to amend their motion to conform with the evidence elicited at the August 8, 1983 hearing on the Packers Act issue because such an amendment is allowed by law and because none of the objecting parties has either represented or attested that, at another hearing, different evidence would be elicited.

*With regard to the priority of claims question, the parties argued as follows:*

*Uhalde* contends that the money he claims from the debtor (1) does not constitute property of the bankruptcy estate; (2) in the alternative, he argues that it constitutes a post-petition debt deserving administrative expense priority, or (3), again in the alternative, he asserts that it constitutes the corpus of a statutory trust created pursuant to the Packers and Stockyards Act, 1921.

*Auza* argues that the money he claims from the debtor (1) constitutes a post-petition debt entitled to administrative expense priority either because the delivery of Auza's sheep occurred after the filing of the petition under Chapter 11 or because Auza's contract with the debtor was under § 365 of the Code, an executory contract, which was assumed by virtue of the debtor's performance of his obligation to take possession of the sheep on May 11, 1983. Auza also argues (2), in the alternative, that fractions of a day or exact moments, such as the time of the filing of the petition in this case, should not be determinative of the parties substantive rights and that, therefore, debtor's debt to Auza should be deemed to have been incurred post-petition; (3) this latter argument, claims Auza, becomes more compelling in light of debtor's deliberate failure to inform Auza of the filing of its petition—a non-disclosure which, Auza argues, constituted bankruptcy fraud and from which the debtor should not benefit; (4) Auza also asserts the same Packers Act "trust theory" asserted by Uhalde.

*Manterola, et. al.* argue that the money they claim from the debtor (1) constitutes an equitable or constructive trust or (2), in the alternative, a trust under the Packers Act that was contemplated by the drafters of the Bankruptcy Code of 1978 as evidenced by the Notes of the Committee on the Judiciary, Senate Report No. 95–989, U.S.Code Cong. & Admin.News 1978, p. 5787, found in the Historical and Revision Notes, 11 U.S.C.A. § 541, West Publishing Co., 1979. Manterola et. al. also argue (3) that the sheep producers are entitled to interest, costs, and attorneys fees under the Packers Act; (4) in the alternative, that their claims are entitled to administrative expense priority payable immediately; and (5) also in the alternative, that the contracts between these sheep producers and the debtor were executory contracts assumed by the debtor by virtue of its performance thereon in accepting delivery of the sheep. Finally, Manterola, et al. argue (6) that all parties had timely notice of the Packers Act issue and that an application

of that law in this case would not violate due process principles.

*Aetna*, on the other hand, argues (1) that all claims arising *before* the moment the petition was filed on May 11, 1983, constitute pre-petition debts entitled to an unsecured claim priority; (2) that the claims of Auza and Manterola arising on May 11, are also pre-petition debts entitled to unsecured claim priority because, under Arizona law, those debts were incurred when the debtor obtained delivery of the sheep, which occurred on the morning of May 11, prior to the time the petition was filed in Utah, and (3) that the May 11, 1983, claim of Wilaha is also a pre-petition debt with unsecured claim priority because Wilaha failed to carry its burden of providing evidence that the sheep were delivered to the debtor after the time the petition was filed. Aetna also asserts that (4) the transactions occurring after May 11 constitute appropriate *post-petition debts deserving administrative expense priority*.

*CSB* asserts some of the same arguments put forth by Aetna and argues additionally (1) that the sheep producers' claim for interest is not entitled to an administrative expense priority and (2) that no payment of claims should be ordered until a determination is made as to the amounts that are due to the claimants under the Packers Act bond held by the debtor.

## DECISION

### (1) THE DUE PROCESS ISSUE

In civil proceedings, due process requires notice and hearing. *Coe v. Armour Fertilizer Works*, 237 U.S. 413, 35 S.Ct. 625, 59 L.Ed. 1027 (1915). In *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), the United States Supreme Court held that "an elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present

**804**

their objections." *See also, Matter of GAC Corp.*, 681 F.2d 1295 (11th Cir.1982). The notice must be served upon the party in sufficient time to enable it to prepare for a hearing. *United States ex rel. Turner v. Fisher*, 222 U.S. 204, 208, 32 S.Ct. 37, 56 L.Ed. 165 (1911).

■ These requirements apply as well to bankruptcy proceedings. In rendering its January 23, 1984 Memorandum Opinion, this court proceeded on the basis that, with regard to notice of the applicability of the Packers Act, due process requirements had been met for the following reasons:

First, the Packers Act was first raised in the proofs of claim filed by Manterola, et. al. dated June 2, 1983.

Second, the Packers Act was mentioned at the July 1, 1983 hearing by Robert Merrill, attorney for CSB who stated:

I would join with the trustee in the motion that this matter be continued to ... allow enough time before the court to explore this matter on a full evidentiary hearing .... There are issues as to whether or not the transactions were pre-petition or post-petition .... [and] as I understand it, under the Packers and Shippers [sic] Act there needs [sic] to be bonds and security held by the broker, Clay in this instance. I don't know if they existed, if the debtor were operating without the required bonds and not in compliance with the statute.

(July 1, 1983, transcript of hearing, page 11.)

Third, at the hearing held August 8, 1983, attorney Robert S. Porter elicited from Raymond C. Williams the following testimony, in support of the "trust theory" arising under the Packers Act:

Testimony about the length of time John Clay had done business:

Q. [PORTER TO WILLIAMS]: ... you described your duties as the buying and selling of lambs for John Clay and Company. How long have you been engaged in that kind of business?

A. 1951

Q. And how long have you been in that business for John Clay and Company?

A. Since 1959, I think.

(August 8, 1983, transcript of hearing, pp. 19–20.)

Testimony on the volume of John Clay's business:

Q. ... John Clay and Company, did it do business on a bigger scale than $500,-000 a year in the buying and selling of lambs?

A. You mean total money handled?

Q. Yes, sir.

A. More than $500,000?

Q. Yes, sir.

A. Yes.

...

Q. Is it in the millions of dollars?

A. Probably would be, yes.

(August 8, 1983, transcript of hearing, pp. 23–24).

Testimony on the extent of John Clay's business:

Q. And you buy and sell these sheep or lambs in what states in this part—in the United States?

A. Arizona, California, Utah, Idaho.

Q. Nevada?

A. Nevada.

Q. And anywhere else?

A. Wyoming.

(August 8, 1983, transcript of hearing, p. 24.)

Testimony regarding John Clay's accounting procedures:

Q. ... does John Clay and Company then have a separate account set up ... into which it deposits the money that Wilaha sheep or any other is supposed to receive?

A. You mean like a custodial account?

Q. Yes ...

A. No.

Q. Do you not have a custodial account?

A. No, we have never had one for 30 years.

Q. Are you aware that there is a requirement for such a custodial account?

A. Well, now, wait a minute .... you are talking about when we had a commission, I mean on the yards, that's a different ....

.        .        .        .        .

Q. Was John Clay and Company then buying these sheep or lambs on its own accounts?

A. No.

(August 8, 1983, transcript of hearing, pp. 31–33.)

Testimony regarding John Clay's intention to continue doing business as usual.

Q. On May 11th, sir, did you find out that John Clay and Company had filed bankruptcy?

A. Not till late afternoon.

.        .        .        .        .

Q. And in your own mind, sir, John Clay and Company was going to continue to do business—

A. Yes.

Q. —in the way that they had normally done?

A. That's right.

(August 8, 1983, transcript of hearing, pp. 34–35.)

Testimony with regard to John Clay's standing as an agent:

Q. And when you have so paid for them after you weighed them, you consider ... those sheep to then be John Clay and Company's?

A. They are John Clay's or the person you [sic] bought them for.

(August 8, 1983, transcript of hearing, p. 37.)

Testimony, elicited by the court, regarding John Clay's commission:

[THE COURT TO WILLIAMS]: I assume it was Clay's intent to sell the lambs for more than it bought them for; is that correct?

THE WITNESS: Yes, we bought them on a commission basis on an order, and which our standard is [sic] 50 cents a hundred.

THE COURT: In these cases you were taking a standard commission?

THE WITNESS: Yes....

THE COURT: Did your commission vary in any of these cases?

THE WITNESS: No, it was standard.

THE COURT: Thank you.

(August 8, 1983, transcript of hearing, p. 76.)

None of this evidence was relevant to the question of whether the claims of these sheep producers were incurred before or after the filing of the petition; nor was it relevant to the question of what priority these claims are entitled to. The testimony was relevant for two purposes only: to determine (1) whether or not the debtor was a "packer", a "dealer" or a "market agent", within the meaning of the Packers and Stockyards Act[5] and (2) whether or not the sale proceeds collected by the debtor from these sheep producers were the subject of two statutory trusts established by §§ 196(b) and 228(b) of the Packers and Stockyards Act, or of two custodial funds established by 9 CFR § 201.42–201.43 (1982).

Fourth, no party present at the August 8 hearing raised any objections to any of this evidence on grounds of relevance or otherwise.

Fifth, the court requested counsel to provide, within 30 days, written briefs on all issues raised at the August 8 hearing.

---

5. "When used in this chapter the term 'packer' means any person engaged in the business (a) of buying livestock in commerce for purposes of slaughter, or (b) of manufacturing or preparing meats or meat food products for sale or shipment in commerce, or (c) of marketing meats, meat food products, or livestock products in an unmanufactured form acting as a wholesale broker, dealer, or distributor in commerce."

"(c) The term 'market agency' means any person engaged in the business of (1) buying or selling in commerce livestock on a commission basis or (2) furnishing stockyard services; and"
"(d) The term 'dealer' means any person, not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser."

Sixth, the trustee, by an *ex parte* motion, sought for and was granted along with all other parties, an extension in which to file his brief on grounds that he needed additional time in which to research the Packers Act.

Seventh, on September 16, 1983, Mr. B.H. Jones, Administrator of the Packers and Stockyards Division of the U.S. Department of Agriculture, in response to a request from the trustee, provided to most of the parties in this action [6] an opinion letter discussing the application of the Packers Act, to this case.

Eighth, on September 22 and 23, 1983, six briefs were filed, all of which contained references to the Packers Act. The three briefs of the sheep producers contained full arguments on the applicability of that Act to this case. The remaining three briefs contained only cursory references to that Act in the context of averments that the Act and the legal theory predicated thereon were not properly before the court.

And ninth, the three parties who did not argue the Packers Act had ample time between September 23, 1983 when the briefs were filed and January 23, 1984 when the court entered its Memorandum Opinion, in which to request leave to file supplemental briefs; but this was not done.

It was in light of these facts, apparent from the record, that the court concluded that due process of law had been accorded to all parties. Now, the proponents of the motions to reconsider claim to have been denied due process.

Opponents to these motions argue not only that due process standards have been met, but that to allow the proponents to cause further delay by filing additional memoranda and scheduling further hearings would do immeasurable injury to the sheep producers whose money, they claim, has been tied up in these proceedings for over a year.

The dilemma facing the court is not a new one: On the one hand there are those litigants who demand that principles (in this case, due process principles) be upheld and that the technicalities of the law be observed while, on the other hand, there are those litigants who want an expeditious resolution of the issues on the merits rather than a hollow gesture to legal niceties. In any such contest, principles may be sacrificed to expedience for the sake of a desirable result. This court, however, is extremely concerned that principles of due process be observed not only in cases where to do so would be convenient, but especially in those cases where to do so would be inconvenient and even burdensome. The concept of procedural due process of law—of ample notice and hearing—is fundamental to Anglo-American adversarial jurisprudence. Though the record before the court seems to evidence that all parties had ample and timely notice of the fact that the Packers Act provisions were in issue in these proceedings, it is also true that timely notice of those issues was not formally given to the parties either in the original written motions of the sheep producers or by way of oral motion at the hearings of July 1 and August 8. Furthermore, the simultaneous briefing by all parties did not afford to CSB, Aetna and the trustee an opportunity to submit rebuttal arguments to the Packers Act "trust fund" theory advanced by Uhalde, Auza and Manterola, et. al.

For these reasons the court, in weighing all the "due process arguments" advanced by the parties, concludes that CSB, Aetna, and the trustee were not technically accorded procedural due process of law.

The court, therefore, withdraws its Memorandum Opinion of January 23, 1984 and declares the "judgment" filed pursuant thereto to be a nullity. A bankruptcy court has continuous power to vacate or modify

---

6. Mr. Jones indicated in his opinion letter that on or about September 16, 1983 a copy thereof was mailed to the following: Robert S. Porter, J. Kent Holland, David C. West, Gary F. Kennedy, Stephen C. Ward, David L. Gladwell, Danny C. Kelly, Larry Rule, Don Godbe, and Steven R. Bailey.

its own orders. *In re Casaudoumecq*, 46 F.Supp. 718, 723 (S.D.Cal.1942). The parties are granted leave of court to submit, within 20 days of the date of this opinion, written briefs on the applicability of the Packers and Stockyards Act, 1921, to the issues raised in these proceedings. In the interest of time, further oral argument will not be heard. Evidence on the Packers Act issue, however, may be submitted in the form of affidavit or, if necessity demands, in an evidentiary hearing to be scheduled by any party requesting it within 30 days of the date of this opinion.

However, the court further concludes that the resolution of this matter does not depend entirely on the application of the Packers Act. For this reason, the court now turns to the "priority of claims" issue raised in the motions of Auza, Uhalde and Manterola, et. al. for determination, allowance, and authorization to pay administrative expenses—an issue which may be disposed of without reference to any but settled principles of bankruptcy law.

### (2) THE PRIORITY OF CLAIMS ISSUE

In this case, there exist assets that must be distributed according to the priorities established in § 726(a)(1) of the Code, which, by reference to § 507, places in first priority those creditors holding administrative expense claims, as defined in § 503. Only after these priority claimants have been fully paid, may distribution of any remaining assets be made to general unsecured claim holders under § 726(a)(2).

■ In their motions, these sheep producers argue that their claims are adminis-

trative expenses under § 503(b)(1)(A) which provides:

(a) An entity may file a request for payment of an administrative expense.

(b) After notice and a hearing there shall be allowed, administrative expenses other than claims allowed under section 502(f) of this title including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries or commissions for services rendered after the commencement of the case: ... [7]

For a claim to be accorded an administrative expense priority, it must be predicated on a debt [8] incurred (1) for the actual and necessary costs of preserving the estate and (2) after the commencement of the case.

The first question to be resolved is which, if any, of these sheep producers' claims are predicated on debts incurred after the commencement of this case.

A case is commenced by the filing of a petition for relief under an appropriate chapter of the Bankruptcy Code. Upon such a filing, an order for relief automatically takes effect and a bankruptcy estate is created. 11 U.S.C. § 301. This case was commenced under Chapter 11 on May 11, 1983, at 1:56 p.m. Utah time and 12:56 p.m. Arizona time.

■ The determination of when a debt is incurred or when a claim arises must be made in light of applicable state law. *Matter of Thomas*, 12 B.R. 432, 433 (Bkrtcy.S. D.Iowa 1981); *Matter of Evans*, 2 B.R. 85, 90 (Bkrtcy.W.D.Mo.1979). Since all the transactions giving rise to the debts, with the exception of the May 17, 1983, sale by

---

7. *See*, 11 U.S.C. § 102(3); COLLIER, states that "[T]he use of the word 'including,' as a word of non-limitation, suggests that the enumeration by Congress in section 503(b) of what constitutes claims for administrative expenses is not necessarily exclusive and precluding." 3 COLLIER ON BANKRUPTCY, ¶ 503.03, at 503–11 through 503–12 (15th ed. 1984). *See also, In re Ridgewood Sacramento, Inc.*, 20 B.R. 443 at 446 (Bkrtcy.E.D.Cal.1982).

8. 11 U.S.C. § 101(11) states that a "debt" means liability on a claim. *See*, 11 U.S.C. § 101(4). The terms "debt" and "claim" are coextensive. A creditor has a "claim" against the debtor, while the debtor owes a "debt" to the creditor. H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 309–310 (1977); S.Rep. No. 95–989, 95th Cong. 2d Sess. 22–23 (1978); The court in *In re King*, 9 B.R. 376, 7 BCD 395 (Bkrtcy.D.C.Ore.1981) noted that the term "claim" is broader than the

Ernest Uhalde, which shall be dealt with separately, occurred in Arizona, the applicable law is found in Arizona Revised Statutes Annotated §§ 44–2325(1),[9] 44–2327(1),[10] 44–2346(1) and (2),[11] 44–2351(A),[12] 44–2355(A)[13] and 44–2359(A).[14]

■ According to these sections, the place for delivery of the sheep was the sheep producer's place of business. Payment to the sheep producers became due at the time and place at which the debtor received the sheep. In the absence of any agreement to the contrary, title to the sheep passed to the debtor at the time and place at which each sheep producer completed his performance with reference to the physical delivery of the goods. And, most critically, tender of delivery of the sheep entitled the sheep producers to payment according to the contract.

In addition to these clear provisions of Arizona law, the Arizona Supreme Court has held that where no time of payment or delivery was specified in the contract, the law, "both at common law and under statutory law ... created a rebuttable presumption that ... payment was to be concurrent with the delivery of the goods." *Balon v. Hotel and Restaurant Supplies, Inc.,* 103 Ariz. 474, 445 P.2d 833 (1968).

The determination of whether these debts arose pre- or post-petition will depend in each case upon whether the delivery of the sheep was completed before or after the exact time of the filing of the petition on May 11, 1983. In making this conclusion, the court expressly rejects the argument that fractions of a day or exact moments, such as the time of the filing of the petition, should not be determinative of the parties' substantive rights.

term "debt." *See also, U.S. v. Breshears,* 698 F.2d 394 (9th Cir.1983).

9. "§ 44–2325. Absence of specified place for delivery
Unless otherwise agreed:
1. The place for delivery of goods is the seller's place of business or if he has none his residence."

10. "§ 44–2327. Open time for payment or running of credit; authority to ship under reservation
Unless otherwise agreed:
1. Payment is due at the time and place at which the buyer is to receive the goods even though the place of shipment is the place of delivery; ..."

11. "§ 44–2346. Passing of title; reservation for security; limited application of this section
Each provision of this article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this article and matters concerning title become material the following rules apply:
1. Title to goods cannot pass under a contract for sale prior to their identification to the contract (§ 44–2349), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this chapter. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the article

on secured transactions (article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.
2. Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading; ..."

12. "§ 44–2351. Manner of seller's tender of delivery
A. Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery. The manner, time and place for tender are determined by the agreement and this article, and in particular: ..."

13. "§ 44–2355. Effect of seller's tender; delivery on condition
A. Tender of delivery is a condition to the buyer's duty to accept the goods and, unless otherwise agreed, to his duty to pay for them. Tender entitles the seller to acceptance of the goods and to payment according to the contract."

14. "§ 44–2359. Tender of payment by buyer; payment by check
A. Unless otherwise agreed tender of payment is a condition to the seller's duty to tender and complete any delivery."

## CLAIMS ARISING PRIOR TO MAY 11, 1983

The record shows with regard to each of the following transactions, the delivery of sheep occurred and, therefore, the claims of these sheep producers arose, prior to filing of the petition:

| Sheep Producer | Date of Delivery | Sales Price |
|---|---|---|
| Frank Zubeldia | 5/2/83 | $ 2,399.95 |
| John Errea | 5/4/83 | 68,846.40 |
| Wilaha Sheep | 5/7/83 | 2,199.76 |
| Frank Zubeldia | 5/8/83 | 1,748.70 |
| Albert Urbeltz | 5/8/83 | 2,725.92 |
| Wilaha Sheep | 5/9/83 | 155,473.06 |

Consequently, these six pre-petition claims are not entitled to an administrative expense priority, but constitute general unsecured claims under § 726(2) of the Code, unless it can be shown that the proceeds of these transactions are not the property of the bankruptcy estate but form the corpus of a trust on behalf of the sheep producers either under the Packers and Stockyards Act, 1921, 7 U.S.C. § 196 and 228(b), or under 9 CFR 201.42–201.43 (1982). This is the issue which is yet to be briefed by the parties.

## CLAIMS ARISING AFTER MAY 11, 1983

The record also shows that, with regard to each of the following transactions, the delivery of sheep occurred, and therefore the claims of these sheep producers arose, after the filing of the petition:

| Sheep Producer | Date of Delivery | Sales Price |
|---|---|---|
| Manterola Sheep Co. | 5/13/83 | $ 85,037.96 |
| Long Tom Sheep | 5/15/83 | 15,850.00 |
| Tony Enchandi | 5/16/83 | 25,707.68 |
| Jean Arriaga | 5/16/83 | 62,643.56 |
| Auza Brothers, Inc. | 5/16/83 | 93,631.16 |
| Ernest Uhalde | 5/17/83 | 9,517.80 |
| Ernest Uhalde | 5/19/83 | 5,323.80 |
| Jean Arriaga | 5/19/83 | 24,334.30 |
| Auza Brothers, Inc. | 5/19/83 | 5,978.78 |
| Jean Arriaga | 5/19/83 | 2,181.55 |
| Tony Enchandi | 5/19/83 | 1,949.25 |

Consequently, these post-petition claims are entitled to administrative expense priority, if they were incurred for the actual and

necessary costs of preserving the bankruptcy estate—an issue that the court will address presently.

## CLAIMS ARISING ON MAY 11, 1983

With regard to the transactions that occurred on May 11, 1983, the court concludes that in each instance where delivery took place *prior* to the filing of the petition at 1:56 p.m. Utah time and 12:56 p.m. Arizona time, the debt incurred was a pre-petition debt, entitled to a general unsecured priority, unless it can be shown that the proceeds owed by the debtor to the sheep producers for the transaction in question constitutes the corpus of a trust under Packers Act, as previously mentioned.

In the event that weighing took place on May 11 after the filing of the petition, the debt incurred gives rise to a post-petition claim entitled to an administrative expense priority if it can further be shown that such debt was incurred for the actual and necessary costs of preserving the estate.

The record in this case shows that there were three transactions between the debtor and sheep producers that occurred on May 11, 1983:

| Sheep Producer | Date of Delivery | Sales Price |
|---|---|---|
| Auza Brothers, Inc. | 5/11/83 | $ 62,582.80 |
| Manterola Sheep Co. | 5/11/83 | 39,228.64 |
| Wilaha Sheep | 5/11/83 | 5,325.80 |

The evidence demonstrates the following:

The procedure for taking delivery of the sheep in each of the three May 11 transactions was generally the same and comprise the following steps: (1) The trucks would arrive at the weigh station where (2) they would be weighed empty. (3) They would then proceed to the sheep corral where the sheep would be (4) sorted and culled and then (5) loaded onto the trucks. (6) The trucks would then return to the station to be weighed again. (7) The weights would be totaled, and (8) the parties would settle their accounts. Finally, (9) the shipment would be hauled away. (August 8, 1983, transcript of hearing, pp. 53–54.)

When a given truck was loaded, it did not normally leave the loading area until all the

trucks at the site were loaded. The drivers stayed to assist each other to complete the loading. (August 8, 1983, transcript of hearing, pp. 63–64.)

It takes about 45 minutes to load an average truck, but this time estimate depends upon weather and the experience of the drivers doing the loading. (August 8, 1983, transcript of hearing, p. 70.)

About 400 sheep can be loaded in an hour. (August 8, 1983, transcript of hearing, p. 70.)

The average truck used to haul sheep can hold about 500 head. (August 8, 1983, transcript of hearing, pp. 70–71.)

According to Raymond C. Williams, it was after the sheep were weighed that delivery was completed and payment was made. (August 8, 1983, transcript of hearing, pp. 36–37.)

The sheep, Williams testified from his knowledge of trade usage, were sold FOB loading point, but the final satisfaction occurred across the scales at the time the loaded trucks were weighed. (Trans. August 8, 1983, p. 64, lines 11 to 13). In all three of the May 11 transactions delivery began in the morning. (Trans. August 8, 1983, p. 63, lines 20 to 22).

Applying Arizona law to this procedure, this court concludes that a seller of goods becomes entitled to payment at the time and place the goods are delivered. In this case, therefore, the debtor's debt to the sheep producers and, conversely, the sheep producers' claims against this debtor, were incurred upon delivery of the sheep, or to be more precise, "at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." Ariz.Rev.Stat.Am. § 44–2346(2).[15] This court finds that, in each of the transactions at issue in this case, the sheep producer completed his performance with reference to the physical delivery of the goods at the moment the loaded sheep were weighed and the weigh tickets were created, at which time the seller's responsibilities to load the sheep ended and his

right to payment was reduced to a quantified dollar amount pursuant to the understanding of the parties (see, August 8, 1983, transcript of hearing, pp. 36–37). It was at the moment of the weighing that delivery was actually completed and the sheep producer's claim arose. If the weighing occurred prior to the moment the petition was filed, the claim was a pre-petition claim; if it occurred after that moment, it was a post-petition claim.

*(1) Auza.* With regard to the May 11 Auza transaction, the delivery was made at Aguila, Arizona (August 8, 1983, transcript of hearing, p. 62), in the presence of debtor's agent Raymond C. Williams (August 8, 1983, transcript of hearing, p. 54) who was with Auza all that day (August 8, 1983, transcript of hearing, p. 55). The loading commenced at 8:00 a.m. (August 8, 1983, transcript of hearing, p. 53; p. 55; July 1, 1983, transcript of hearing, p. 23). The trucks were weighed in empty at about 8:00 a.m. (August 8, 1983, transcript of hearing, p. 55). Sorting and culling began at about 8:30 a.m. (August 8, 1983, transcript of hearing, p. 55,). The sorting process took approximately two hours (August 8, 1983, transcript of hearing, p. 55). The loaded trucks arrived in town for weighing at about 1:30 p.m. (August 8, 1983, transcript of hearing, p. 56). Then about two hours were taken out for lunch; and somewhere between 3:00 to 5:30 p.m. the debtor settled its account with Auza Brothers by issuing a draft for the purchase price of the sheep (July 7, 1983, transcript of hearing, p. 18; August 8, 1983, transcript of hearing, p. 57).

From this evidence, the court finds that delivery took place at the time the loaded trucks were weighed, which occurred sometime between 1:00 p.m. and 3:30 p.m. Arizona time. Hence, delivery of the Auza sheep occurred after the filing of the petition at 12:56 p.m. Arizona time. This transaction, therefore, gives rise to a post-petition claim which is entitled to an administrative expense priority if it is found to

15. *See,* note 11, *supra.*

have been incurred for an actual and necessary expense of preserving the estate.

*(2) Manterola.* With regard to the Manterola transaction of May 11, the delivery took place at Casa Grande, Arizona (August 8, 1983, transcript of hearing, pp. 48–49) at approximately 6:00 a.m. (July 7, 1983, transcript of hearing, p. 38.) Manterola handled its own loading operation; no agent of the debtor was present (August 8, 1983, transcript of hearing, p. 54; p. 95). The shipment was weighed at the place of delivery, Casa Grande (August 8, 1983, transcript of hearing, p. 63). There were only two truck loads of sheep, and they were loaded and weighed prior to 9:00 a.m., at which time they departed with their shipments of 578 lambs (July 1, 1983, transcript of hearing, pp. 41–42). It was understood by Manterola that the delivery of goods would be completed when the loaded and weighed truck leaves the station (July 1, 1983, transcript of hearing, p. 43).

From this evidence, the court finds that delivery of the Manterola sheep took place at the time the trucks were weighed, which occurred prior to 9:00 a.m. Arizona time. Since delivery occurred before the 12:56 p.m. filing of the petition, this transaction gives rise to a pre-petition claim which is entitled to a general unsecured claim priority, unless it is found that the Packers Act applies, as before mentioned.

*(3) Wilaha.* With regard to the Wilaha transaction of May 11, the sheep had first to be hauled from the deserts north of Sun City to the point of delivery (August 8, 1983, transcript of hearing, p. 63). There were 76 sheep in this load, which represented the third and final shipment of sheep to the debtor (August 8, 1983, transcript of hearing, pp. 64–65). The owner of Wilaha Sheep Company, Philipe Perez, was not present at the time the sheep were loaded onto the truck (August 8, 1983, transcript of hearing, pp. 95–96). However, Perez testified that his son was present at the delivery site and that at about 10:30 a.m. his son called him to tell him that the truck had not yet arrived (August 8, 1983, transcript of hearing, p. 97). Perez called Casa Grande and was told that the truck was on its way (August 8, 1983, transcript of hearing, p. 97). Perez testified that the loaded truck left the Road Runner truck stop in the afternoon (August 8, 1983, transcript of hearing, p. 96).

It is unclear from the evidence precisely when the trucks arrived, when they were loaded, and when they were weighed. Thus, the time of delivery and the time the Wilaha claim arose cannot be determined. Since it is the creditor's burden to establish these facts and since the creditor here has failed to do so, the court cannot find that the claim arising out of this transaction is a post-petition claim. Therefore, Wilaha's motion for determination, allowance and authorization for an administrative expense priority of the claim based on this transaction cannot now be granted.

## THE UHALDE CLAIMS

With regard to the Uhalde transaction of May 17, 1983, the court finds that an oral contract for the sale of 232 lambs was entered into between Uhalde and the debtor, acting as agent for John F. Griggs. Delivery of these lambs took place on May 17, 1983 in Emadara County, California. Upon delivery of the sheep, Uhalde was presented with a check from Griggs for $9,517.80. The check was made out to the debtor and Uhalde jointly. Uhalde was told by Raymond C. Williams that the debtor would endorse the check so that all the proceeds thereof, representing the exact purchase price of the lambs due to Uhalde, could be paid over to him. Debtor failed to endorse the check as promised. Uhalde argued that the proceeds of this check did not constitute property of the estate under § 541(a)(1) of the Code, because the debtor has no legal or equitable interest therein.

The court finds, to the contrary, that because the check was made payable to the debtor as well as Uhalde and because it could not be cashed with the debtor's signature, which was never endorsed on the check, the debtor had a disputable legal interest in the proceeds thereof at least as valid as a naked possessory interest. For

these reasons, the check and the proceeds payable thereon are property of the estate under § 541(a)(1) of the Code. Thus, Uhalde is not entitled to those proceeds under that theory unless he prevails on a § 362 motion to lift the stay protecting those proceeds as assets of the estate.

However, for reasons stated previously, he would be entitled to an administrative expense priority for that sum, along with the other post-petition claimants, if his and the other post-petition debts are determined to have been incurred for the actual and necessary costs of preserving the estate.

## ACTUAL AND NECESSARY COSTS

To determine whether any of these post-petition claims were incurred for the actual and necessary costs of preserving the estate, the court turns to the dispositive case of *In re Ridgewood Sacramento, Inc.*, 20 B.R. 443 at 446 (Bkrtcy.E.D.Cal.1982), where the court held:

> In a situation such as exists here, the fact is that the creditor supplied the debtor, which was continuing to operate its business pursuant to Chapter 11, with goods which were essential to the debtor if it was to continue operating its business. The supply of goods to a Chapter 11 debtor is just as necessary to pursue the operation of the debtor's business as is the payment of wages, salaries or commissions. Thus, the creditor's claim, because it was based on a factor which was necessary for the debtor to carry on its business, must be treated as an expense of administration pursuant to 11 U.S.C. section 503(b)(1)(A).

*Ridgewood* stands for the proposition that a claim arising on a debt for goods delivered post-petition to a debtor is as much entitled to an administrative expense priority, for the actual and necessary cost of preserving the estate, as is a claim arising on a debt for services rendered after the commencement of the case. Here, each transaction involving post-petition delivery of sheep to the debtor in possession, John Clay Co., was as essential to the continuing operation of the debtor's business as might have been the payment of any wages, salaries, or commissions for services rendered after the commencement of the case.

Accordingly, all those claims of sheep producers predicated on debts resulting from the post-petition delivery of sheep to the debtor are entitled to administrative expense priority under Section 507(a)(1) and 503(b)(1)(A) of the Code.

## INTEREST

■ With regard to the question of interest to be paid to these claimants, there is nothing in the Code to permit the payment of interest to those holding an administrative expense claim.

The payment of interest to unsecured claimants is another matter.

■ In the case of *In re Spanish Trails Lanes, Inc.*, 16 B.R. 304 (Bkrtcy. Ariz.1981), the court held that, in determining which claims are allowable, a bankruptcy court should look to state law to determine the origin and existence of a claim. However, after such an initial determination, state law no longer controls, and the court is free to use its equitable powers to determine the allowability of the claim. *See, Matter of Bowers*, 16 B.R. 298 (Bkrtcy.Conn.1981); *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). *See also, Matter of Thomas, supra*, and *Matter of Evans, supra.*

■ If the state, under whose law the claim or debt arose, provides for a legal rate of interest in transactions where no contractual rate is provided, then the allowed claim should include the amount of the matured interest from the date the debt was incurred until the date of the filing of the petition, unless the court, in the exercise of its equitable powers determines otherwise.

This interpretation is implied by the language of 11 U.S.C. § 502(b)(2) which forbids the allowance of a claim for "unmatured" interest—the negative implication being that claims for pre-petition interest, under state law, are allowable if they are

"matured." *See also,* BANKRUPTCY SERVICE LAWYERS EDITION, § 21:13 at p. 26 (1979 as amended 1984).

 The unsecured claimants in this case are entitled to interest, in the absence of a contract providing therefor, at the legal rate, established by applicable state law, from the time the respective debts were incurred until the date a petition under any chapter of the Bankruptcy Code is filed. In a case under Chapter 7, such as this one, if there are adequate assets, then the unsecured creditors would also be entitled to the interest accruing on their claims post-petition or, if the funds are inadequate to pay such interest in full, to their pro-rata share of such funds to be distributed among all unsecured creditors, to satisfy their interest claims. See § 726(a)(5).

The court reserves for a later determination whether or not interest is due to these claimants in the event the Packers and Stockyards Act, 1921 is found to be applicable to the transaction considered herein.

## CONCLUSION

It is the opinion of this court that all the transactions between the debtor and the various sheep ranchers listed here occurring after the moment of the filing of the petition on May 11, 1983 are claims entitled to administrative expense priority under Section 503(b)(1)(A) of the Code, as the actual and necessary costs and expenses of preserving the estate, while all those occurring prior to the moment of filing are claims entitled to an unsecured claim priority. The administrative expense claimants, including Ernest Uhalde, though not entitled to interest, are entitled to the immediate payment of their claims for expenses from the assets of the estate. The unsecured claims are entitled to payment with interest at the legal rate in the usual course of the orderly liquidation of the estate pursuant to Section 726 of the Code.

The Memorandum Opinion and Order of January 23, 1983 is withdrawn and the unsigned judgment predicated therein is a nullity.

The parties are granted leave to file, within the time limits and subject matter restrictions set forth herein, their briefs relating to the question of the applicability of the Packers and Stockyards Act, 1921.

The trustee is ordered to withhold payment of any funds pursuant to this question until the Packers Act question is resolved. An order will enter consistent with the findings of fact and conclusions of law set forth herein.