865 F.2d 673
 20 Collier Bankr.Cas.2d 716, 18 Bankr.Ct.Dec. 1529,
Bankr. L. Rep. P 72,719
 In the Matter of D & F CONSTRUCTION INC., Debtor.
FEDERAL SAVINGS & LOAN INS. CORP. as Conservator for Mercury
Savings Association of Texas and Ben Milam Savings
and Loan Association, Appellant,
v.
D & F CONSTRUCTION, INC., Appellee.
 No. 87-1903.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 17, 1989.
 
 Erin Y. Baker, Dallas, Tex., Keith P. Ellison, Mary Millwood Gregory, Houston, Tex., Michael A. McConnell, Fort Worth, Tex., for appellant.
 Tim Truman, Fort Worth, Tex., for appellee.
 Appeal from the United States District Court for the Northern District of Texas.
 Before CLARK, Chief Judge, TIMBERS* and RUBIN, Circuit Judges.
 CLARK, Chief Judge:
 
 
 1
 This is a Chapter 11 bankruptcy case. D & F Construction, Inc., ("the debtor"), proposed a Chapter 11 plan of reorganization to which only Mercury Savings Association of Texas and Ben Milam Savings and Loan Association ("Mercury/Milam") objected. The bankruptcy court confirmed the debtor's plan over Mercury/Milam's objection under the "cram-down" provisions of 11 U.S.C. Sec. 1129(b). The district court affirmed. Mercury/Milam appeals. We reverse the judgment of the district court upholding the confirmation and remand with directions.
 
 
 2
 On August 29, 1984 Cimarron Properties Joint Venture ("Cimarron") obtained a $6.4 million construction loan from Mercury/Milam to purchase land and construct a 192-unit apartment complex in Fort Worth, Texas. The loan was evidenced by a one-year promissory note and was secured by a deed of trust, a financing statement, and an assignment of rents.
 
 
 3
 Cimarron purchased land and commenced construction, but was unable to complete the apartment complex. Richard Drummonds and David Ford agreed to complete the construction of the complex and formed the debtor corporation for that purpose. The debtor made an agreement with Mercury/Milam whereby it assumed the construction loan, acknowledged the security agreements, and received an additional $960,000 loan from Mercury/Milam. This loan was secured by a second lien on the complex. The debtor also executed a Net Profits Agreement with Mercury/Milam, which provided that Mercury/Milam and the debtor would split on a fifty-fifty basis (i) the net cash flow generated from the apartment complex, (ii) the net proceeds from significant events such as insurance awards and condemnation proceedings and (iii) any net proceeds received upon sale or refinancing of the apartment complex.
 
 
 4
 The debtor completed construction of the complex but failed to pay the construction loan upon expiration of its term. Mercury/Milam began foreclosure proceedings, and on October 6, 1986 the debtor filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code.[1] Mercury/Milam filed a proof of claim for approximately $7 million. The bankruptcy court valued the apartment complex at $5 million, and found that amortization of this amount at a ten percent (10%) annual interest rate would provide Mercury/Milam with the present value of its security. In December 1986, Mercury/Milam filed an election under 11 U.S.C. Sec. 1111(b) to treat the entire amount of its claim as secured.
 
 
 5
 The debtor filed a plan of reorganization on February 23, 1987. The plan provided for Mercury/Milam's secured claim as follows: (i) Mercury/Milam's liens on the apartment complex would be evidenced by a new deed of trust; (ii) the Net Profits Agreement would be rejected and Mercury/Milam would instead receive one-half of any net proceeds from the sale of the complex for an amount in excess of its claim; (iii) Mercury/Milam would be paid the $5 million present value of its security over a fifteen-year period with interest at the rate of 10% per annum on the unpaid balance. The plan provided for increasing monthly payments during the fifteen-year period beginning at $30,000 and increasing to $47,500 for years six through fifteen. Initially the monthly payments would be insufficient to cover the interest accruing, so at the end of the fourth year the amount owed to Mercury/Milam would increase from $5 million to $5,350,875.39. Ensuing payments would begin then to reduce the principal, but not until the end of the twelfth year would the amount owed fall below $5 million. At the end of the fifteenth year more than $4.7 million would still be owed, and the plan provided for a balloon payment of $4,740,980.19 on April 15, 2002.
 
 
 6
 The plan specified that Mercury/Milam had no unsecured claim because of the Sec. 1111(b) election. The plan also contained provisions for the payment of five other classes of claims totalling less than $100,000, and allowed Messrs. Drummonds and Ford to purchase 100% of the stock in the reorganized debtor for $10,000.
 
 
 7
 The bankruptcy court confirmed the debtor's plan over Mercury/Milam's objections. The district court upheld the confirmation, and Mercury/Milam appeals.
 
 
 8
 Section 1129(b)(1) of the bankruptcy code provides that a debtor may "cram down" its plan over the objection of a creditor "if the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. Sec. 1129(b)(1). Section 1129(b)(2) then sets forth requirements which must be met for a plan to be "fair and equitable."[2] A plan which does not meet the standards set forth in Sec. 1129(b)(2) cannot be "fair and equitable." However, technical compliance with all the requirements in Sec. 1129(b)(2) does not assure that the plan is "fair and equitable." 5 Collier on Bankruptcy p 1129.03 at 1129-52 (15th ed. 1988). Section 1129(b)(2) merely states that "the condition that a plan be fair and equitable with respect to a class includes the following requirements...." 11 U.S.C. Sec. 1129(b)(2) (emphasis added). Section 102(3) of the bankruptcy code states that the word "includes" is not limiting. 11 U.S.C. Sec. 102(3). The sponsors of the Bankruptcy Reform Act of 1978 noted:
 
 
 9
 Although many of the factors interpreting 'fair and equitable' are specified in paragraph (2), others, which were explicated in the description of section 1129(b) in the House report, were omitted from the House amendment to avoid statutory complexity and because they would undoubtedly be found by a court to be fundamental to 'fair and equitable' treatment of a dissenting class.
 
 
 10
 124 Cong.Rec. 32,407 (1978). Section 1129(b)(2) sets minimal standards plans must meet. However, it is not to be interpreted as requiring that every plan not prohibited be approved. A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is "fair and equitable." See In re Spanish Lake Associates, 92 B.R. 875, 878 (Bankr.E.D.Mo.1988); In re Edgewater Motel, Inc., 85 B.R. 989, 998 (Bankr.E.D.Tenn.1988).
 
 
 11
 Assuming without deciding that the requirements set forth in Sec. 1129(b)(2) are literally met, the debtor's plan is neither fair nor equitable. Mecury/Milam did not lend its credit to this project on the strength of Cimarron's fiscal integrity nor that of the debtor. It furnished the funds that paid for constructing the apartments on the basis that it be given a right under Texas law to recover its funds from the land and improvements if they could not be repaid as promised. The debtor and all other creditors are bound to have recognized this situation when they contributed their time and goods. Yet, under the plan, Mercury/Milam cannot exercise the foreclosure rights it reserved. In addition, the plan's negative amortization requires that for the first twelve years Mercury/Milam increase its financing of this project and thus assume a worse financial position than it was in at the time of confirmation.[3] The net effect of negative amortization is to force Mercury/Milam to make a post-confirmation loan to the debtor for a period of twelve years.
 
 
 12
 We do not hold there can never be an occasion when negative amortization would be fair and equitable. We do say this plan is not fair and equitable. Negative amortization coupled with deferring substantially all repayment of principal for fifteen years can only be considered reasonable if one speculates that the present condition of the Fort Worth, Texas real estate market will improve substantially. While this speculation may be wholly acceptable from the standpoint of the debtor and the other classes of creditors, it is an altogether impermissible speculation from the standpoint of Mercury/Milam which is effectively denied access to the security it contracted for during the next fifteen years and must furnish further funding to the project.
 
 
 13
 A plan that is not fair and equitable with respect to an impaired secured creditor cannot be confirmed on the basis that such inequity is necessary to protect junior creditors. If market conditions are such that an effective plan of reorganization cannot be developed that is fair and equitable to dissenting creditors, Mercury/Milam is entitled to foreclose on its liens. In re Timbers of Inwood Forest Associates, Ltd., 808 F.2d 363 (5th Cir.1987), aff'd, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).
 
 
 14
 Without deciding whether the debtor's plan might meet the literal requirements of Sec. 1129(b)(2), we held that it is not fair and equitable as to Mercury/Milam. This holding makes it unnecessary to reach Mercury/Milam's other arguments.
 
 
 15
 The judgment of the district court is reversed with directions to vacate the order of the bankruptcy court confirming the debtor's plan and remand the estate to the bankruptcy court for further proceedings not inconsistent with this opinion.
 
 
 16
 REVERSED AND REMANDED WITH DIRECTIONS.
 
 
 
 *
 Circuit Judge of the Second Circuit, sitting by designation
 
 
 [1]
 In March 1986 the Federal Savings and Loan Insurance Corporation (FSLIC) became conservator for Mercury/Milam and is the real party in interest in this proceeding. For convenience this opinion refers solely to Mercury/Milam
 
 
 [2]
 11 U.S.C. Sec. 1129(b)(2) provides:
 For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
 (A) With respect to a class of secured claims, the plan provides--
 (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
 (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
 (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
 (iii) for the realization by such holders of the indubitable equivalent of such claims.
 (B) With respect to a class of unsecured claims--
 (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
 (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.
 (C) With respect to a class of interests--
 (i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or
 (ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.
 
 
 [3]
 See In re Spanish Lake Associates, 92 B.R. at 878-79 (plan not fair and equitable where negative amortization caused level of debt to be greater than on date of confirmation for eleven years after confirmation); In re Edgewater Motel, 85 B.R. at 998 (plan not fair and equitable where negative amortization caused level of debt owed to be greater than on date of confirmation for eight years after confirmation); In re Anderson Oaks (Phase I) Ltd. Partnership, 77 B.R. 108, 110 (Bankr.W.D.Tex.1987) (negative amortization fatal to confirmation of plan where level of debt would not return to where it was on the date of confirmation until twelve years after confirmation)