In re Herman Frederick
**SCHOENEBERG,**
Debtor.

**Bankruptcy No. 92–11458–FM.**

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

April 7, 1993.

Conde Thompson Cox, Cox and Rodnick, Austin, TX, for debtor.

Barnett B. Skelton, Jr., Houston, TX, for Federal Land Bank.

## MEMORANDUM OPINION ON DEBTOR'S AMENDED PLAN

FRANK R. MONROE, Bankruptcy Judge.

The Court held hearings on confirmation of the Debtor's Amended Plan on January 21, 1993, and January 28, 1993. Pursuant to the record established, the briefs of the parties, the arguments of counsel, and the Court's own independent research, this Memorandum Opinion is being entered as Findings of Fact and Conclusions of Law under Bankruptcy Rules 7052 and 9014. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L) since it is a contested matter dealing with confirmation of the Debtor's Amended Plan. The matter is, therefore, one which arises under Title 11 and jurisdiction is vested in this Court to enter a final order by virtue of 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 151, 28 U.S.C. § 157(a) and (b)(1) and the Standing Order of Reference in this District.

*Findings of Fact*

The Debtor filed his voluntary Chapter 11 petition on April 28, 1992. The Debtor is 59 years old. He began ranching in 1981 after leaving a public accounting practice. As part of his ranching venture the Debtor purchased several large tracts of rural real estate. The values of this property as of the Petition Date were substantially less than the balance owed on the purchase money indebtedness secured by them. Further, much of the Debtor's previous equity in other assets such as stock and retirement plans had been used pre-petition to maintain the debt payments on the land and sustain the cash losses incurred by the Debtor in his cattle operations as the cash income from the Debtor's operation of his ranching and cattle business was far short of what was required to pay the expenses related thereto and the debt service on the land.

One of the reasons for this negative cash flow was that the Debtor made a conscious decision to create "economic gain" in the form of increased value of his cattle herd as opposed to creating "cash gain" from the sale of the same. He did this by gradually changing the mixture of his cattle herd so that it was more concentrated with pure bred cattle, specifically the Simmental and Simbrah varieties and less concentrated with commercial breeds of cattle. This gradual downsizing of the commercial portion of his herd meant that the only income Mr. Schoeneberg received from the sale of cattle was from the sale of his commercial cattle which sold at lower prices than the registered pure bred cattle. This allowed him to keep, for the most part, the offspring of the pure bred mother cows. The result of this strategy and the large interest carry on the land notes was cash operating losses.

Additionally, Mr. Schoeneberg's operations were negatively affected by various bad management decisions which resulted from Mr. Schoeneberg's inexperience in the cattle business. For example, during the severe drought in the late 1980's instead of taking that as an opportunity to downsize the commercial portion of his herd (and the costs related to their feed and care), he tried to maintain his entire herd size and feed them all. He, therefore, incurred exceptionally excessive feed costs as related to the value being added to the herd thereby; this added to his losses. And, as we have noted, as a result of the inflated prices he paid for his real estate which he purchased on a highly leveraged basis, the Debtor's interest costs was excessive in relation to his ability to generate cash from the operations conducted thereon.

The ultimate result was that the Debtor's cattle operations showed a negative cash flow of $145,000.00 in 1989 *before* debt service and approximately $75,000.00 in 1990 *before* debt service. His tax loss from his cattle operations as per his filed income tax returns were $500,000.00 plus in 1988 ($142,000.00 in depreciation and $174,000.00 in interest), $615,000.00 in 1989 ($133,-000.00 in depreciation and $210,000.00 in interest), and $476,000.00 in 1990 ($122,-000.00 in depreciation and $177,000.00 in interest).

The Farm Credit Bank of Texas (the "FCB") objects to the Debtor's plan alleging that it is not feasible and points to this dismal past performance by the Debtor in attacking the reliability of the Debtor's pro forma of future performance upon which the Debtor's repayment plan rests. On the other hand, the Debtor points to these prior years as being to some extent artificial losses which were created by the combined effect of his decision to take cash losses that would result in economic gain to the quality and value of his herd, the mistakes he made during the drought in the late 1980's, which he says he will not make in the future, and his excessively large interest carry on real estate that he will not own under his Plan.

Mr. Schoeneberg is a very self-confident person, almost to the extent of being egotistic with regard to his abilities as a cattle manager. One of the things the Court has analyzed is whether or not Mr. Schoeneberg can be realistically expected to act in the future in a manner which will be consistent with and protect the interest of his creditors whom he is asking to wait and get

paid from the projected *future* cash flow from his cattle operations or whether he will continue to make decisions based solely on what he perceives will build the value and "prestige" of his cattle herd. The Court had some degree of concern as to whether Mr. Schoeneberg could be trusted in the future to make the appropriate decisions to insure creditor payment on the plan. In part this is because he repeatedly stated in his testimony that he would sell cattle in the future *only if he needed to.* And, he had liquidated a tremendous amount of non-ranching assets in the past to build his herd in the face of what he surely must have known would be large losses. Further, Mr. Schoeneberg strikes me as the type of person who does not easily take advice from others when it is contrary to what *he* thinks is best. However, he did say that if he needed to make payments under the plan, that would be a sufficient need in his mind to sell cattle. He has not engaged in any significant sales program during the Chapter 11 because he has not needed to; that is, he has been awaiting the outcome of his plan to see what exactly what might be required. Upon reflection the Court feels that when the time comes Mr. Schoeneberg will see making plan payments as a sufficient need to make the decisions required.

According to the disclosure statement as of October 31, 1992, Mr. Schoeneberg's inventory of cattle was as follows:

| Type | Bulls | Cows | Calves |
|---|---|---|---|
| Pure bred Simbrah | 34$^{17}$/24ths | 211 | 54 |
| Simbrah (¼ × ¾) | 1⅓ | 14½ . | 4 |
| Simbrah (½ blood) | 1 | 49½ | 17 |
| Simbrah (¾ × ¼) | 7½ | 35 | 11 |
| Full Blood Simmental | 3 | 32½ | 3 |
| Pure bred Simmental | 3 | 24 | 2 |
| Pure bred Santa Gertrudis | 1 | 46 | 20 |
| Pure bred Brahman | 0 | 14 | 5 |
| Recipient Cows Bred to have P/B Simbrah calves | | 32 | 22 |
| Bred to have F/B Simmental calves | | 3 | 3 |
| Open or bred to have commercial calves | | 65 | 25 |
| Commercial | 1 | 165 | 37 |
| Total | 52$^{13}$/24ths | 691½ | 203 |

Mr. Schoeneberg's business plan is based upon the theory that over a period of time through a combination of producing new calves and selling off selected mature cows, sufficient cattle can be sold at sufficient prices both to pay the expenses of operation and create a net profit sufficient to service the debt existing under the plan, provide a return to the equity (here money to live on), and maintain herd quality, herd age, and herd size at acceptable levels.

Mr. Schoeneberg acknowledged that the success of his plan is based upon this assumption and it was clear from his testimony that he felt he could perform on that basis. It was also clear that his cattle expert, Tim Smith, who is apparently a very successful cattleman in a similar business operation to that of the Debtor, thinks Mr. Schoeneberg now has the management skills, ability and experience together with the appropriate quality and size of herd to, at the present time, do exactly that.

If the Debtor were required to liquidate his herd and pay creditors on an involuntary basis, the Debtor's own liquidation analysis reflects that the sale of his bulls and cows alone (without consideration of his existing calves producing any extra income—current schedule shows 200 or more) would generate approximately $717,000.00. This number was reached by valuing the bulls at $1500.00 each, the pure bred cows and heifers at $1200.00 each, a few pure bred cows at salvage value of $500.00 each, and the commercial cows at a range of between $500.00 and $700.00 each. From the testimony of all parties it was clearly established that these prices were low and that the bulls may well average a per-head price of closer to $2,000.00 and that the pure bred cows may average at a price closer to $1700.00 since those numbers are closer to Mr. Schoeneberg's actual experience over the past twelve (12) months or so. If the liquidation value of the herd were based on these values, it would be increased by an additional $200,000.00 to the total of approximately $920,000.00. Additional assets available for liquidation are the miscellaneous farm assets valued at $40,000.00, the equity in remaining land of approximately $60,000.00, and other miscellaneous assets of $80,000.00, for a total of additional assets of approxi-

mately $180,000.00. Adding the cattle and the miscellaneous assets and land, you reach a total of $1,200,000.00 using the higher value for the cattle. Deducting the debt secured by those assets of approximately $90,000.00 to $100,000.00, you reach a net liquidation value of $1,100,000.00. This means that this estate is solvent because the unsecured claims being dealt with under the plan are as follows:

Administrative—maybe $2500.00 more owed

Farm Credit Bank—$315,000.00 at the petition date unsecured

Others—$60,000.00 at the petition date unsecured

So, the ratio of the estate's liquidation value to the amount of unsecured debt is approximately 3 to 1.

So the question naturally comes to mind, "Why is Mr. Schoeneberg in Chapter 11?" Simple. He could not reach an agreement pre-petition with FCB on either reinstatement or restructure of the three land notes which he had with them. So he had to file Chapter 11 to preserve his cattle herd and his business operations. Two of those land notes have been partially satisfied by FCB foreclosing upon the collateral for an agreed upon foreclosure and credit price. The third land note, the parties have agreed, has a collateral value of $350,000.00, and that indebtedness is being treated in a separate class in a manner consistent with FCB regulations and the provisions of § 1129(b)(2)(A). The unsecured debt of $315,000.00 is, therefore, the deficiency resulting from the three land notes.

The real underlying question to this confirmation battle is whether or not the Debtor should be forced to liquidate (as FCB has suggested in a competing plan which was set for confirmation a month after the Debtor's plan and was continued sua sponte by the Court) or whether Mr. Schoeneberg should be allowed to pay out the deficiency over a 20–year period of time with interest. This requires the Court to consider in its analysis of FCB's various objections the competing interests upon which the Bankruptcy Code was built, i.e.

the adequate protection of creditor's rights and the public policy behind allowing debtors to reorganize in a manner that keeps the business going. And, the Court has done so in making its decisions with regard to the various objections of FCB.

## CONCLUSIONS OF LAW

### A. *Classification—*

■ The Debtor has proposed a plan which creates two unsecured classes of creditors, the unsecured claim of FCB in one class and everyone else in the other. FCB voted against the plan, everybody else voted in favor of it. FCB says this classification scheme violates $1122 as interpreted by the Fifth Circuit in *Matter of Greystone III Joint Venture*, 948 F.2d 134 (5th Cir. 1991). This Court disagrees.

The *Greystone* facts are 180 degrees from these facts. *Greystone* dealt with a $3.5 million unsecured deficiency claim on what was a non-recourse secured loan on an office building which was classified separately from less than $10,000.00 of trade debt in what the Fifth Circuit found was an effort to gerrymander the classes for the purpose of creating an accepting class of impaired creditors under 1129(a)(10). This case, on the other hand, has five secured classes, four of which have accepted the plan. The only secured class which did not accept the plan was the Federal Land Bank on its secured claim; and, as we will discuss later on, cram down of that class is appropriate.

It is clear that the Debtor's division of the unsecured creditors into two classes, one—the deficiency of FCB, and two—all other unsecured claims does not run afoul the Fifth Circuit's prohibition against gerrymandering set forth under headnote 5 in the *Greystone* opinion at page 139. Why? Because no gerrymandering has occurred in this case. The two separate unsecured classes in *Greystone* were to receive the *same* treatment under the plan; a factor which did not go unnoticed by the Fifth Circuit in its determination that the "reasons for separately classifying the Phoenix

deficiency claim simply masked the intent to gerrymander the voting process, ...". And, it was largely upon this basis that the Fifth Circuit determined the classification scheme should not have been approved. Specifically, the Circuit stated as follows:

Greystone argues that the 'realities of business' more than justify separate classification of the trade debt from Phoenix's deficiency claim. The argument is specious, for it fails to distinguish between the *classification* of claims and the *treatment* of claims. Greystone's justification for separate classification of trade claims might be valid if the trade creditors were to receive a different treatment from Phoenix.

Therefore, it is clear that the Fifth Circuit left open the door for separate classification of unsecured debt so long as it is treated separately and there exists good business reasons for the separate classification and treatment. So the inquiry in this case, where the Debtor has provided separate treatment for the two different unsecured creditor groups, is whether there are good business reasons for the Debtor to have done so.

Class 8 is all other unsecured claims. They total approximately $60,000.00. The Debtor will pay them over 20 years in annual payments with simple interest at the rate of 8%. They remain unsecured. They voted for the Plan.

Class 9, which is the FCB deficiency claim in the approximate amount of $315,-000.00 as of the petition date, is to be paid in monthly payments with interest at the annual simple variable rate established from time to time by the FCB as its maximum conventional interest rate under the Farm Credit Act of 1971, as amended. And, the monthly payment will be changed from time to time as the rate changes. Further, the claim will be secured by a security interest on all cows and bulls now owned or hereafter acquired by the Debtor (almost a 3 to 1 value to debt ratio) and, in the event of default, FCB may exercise the lien rights the Plan gives it under Part 5 of Ch. 9 of the Texas Business & Commerce Code. A default is declared to exist if at anytime the Debtor owns less than a total of 400 total head of cows and bulls or if payment is not made timely under the plan and notice is given of the default and, after the expiration of a 20 day grace period from date of notice, Debtor has not cured such monetary default. Further, the plan provides that all reasonable necessary documentation on Texas Bar Forms used for such purposes shall be executed by the Debtor in order to reflect the creation the such security interest and to allow to be perfected.

The Debtor testified that the purpose of separate classification and treatment for FCB was the Debtor's recognition that pre-petition FCB had collateral the value of which declined dramatically due to market conditions resulting in it having a large unsecured deficiency claim whereas all the other unsecured creditors never had any collateral of any sort to begin with. And, that is why he determined it important to give FCB replacement collateral and not the other unsecured creditors. Additionally, a difference in interest rate was proposed so that there would not be any question but that the Debtor was honoring 12 U.S.C. § 2205 which sets the interest rates that FCB uses in all voluntary loan transactions.

So, the crux of the different classification and treatment is that FCB is being treated *better* than the other unsecured creditors; and it is complaining. Not only does a question of standing to complain arise, but a question with regard to the motivation to the objecting party arises. Clearly FCB has told its lawyers to do whatever is necessary to make sure that the Debtor's plan is not confirmed regardless of what it provides and to push its own liquidation plan instead. The purpose is to try to force full payment of all of its claims in cash as soon as possible regardless of the effect on the Debtor's business and the Debtor's ability to earn a living for himself as a rancher in the future. And, this instruction to oppose is in the face of a clear 3 to 1 ratio of liquidation value to unsecured debt and a proposed collateral value to FCB debt ratio in the same range.

The Court concludes that the business reasons outlined above as argued by the Debtor in support of his separate classification and the fact that FCB's treatment is more favorable than that of other unsecured creditors amply justifies such separate classification and treatment and meets the guidelines set forth in *Greystone.*

The only other classification argument made by FCB was that Lee County Farmers Coop is a creditor that is in reality secured by stock in the Coop that the Debtor was required to own in it in order to have borrowed money from it, and that it has been wrongfully lumped together with the general class of other unsecured creditors. However, Lee County Farmers Coop has made no objection to such classification. In fact, it has authorized Debtor's counsel to represent to the Court that it fully agrees with its classification and their treatment provided therein. Further, it should be noted that FCB placed absolutely no evidence whatsoever into the record that Lee County Farmers Coop was secured in any shape, form or fashion whatsoever. Accordingly, that objection is overruled.

B. *Post-petition Interest—the "best interests" test.*

■ Since this is an estate that is clearly solvent, a rather novel issue arises. In the context of the best interest test contained in § 1129(a)(7), what interest rate must the Debtor provide upon FCB's claims (both under– and unsecured) for the period of time from the petition date until the effective date of the Plan. Stated another way, § 1129(a)(7)(A)(ii) provides that a plan must, with respect to each impaired class of claims, provide that each holder of a claim of such class who has not accepted the plan receive property of a value on the effective date of the plan that is not less than the amount that such holder would have received if the Debtor were liquidated under Chapter 7 *on that date.* If that is read to mean that if the Debtor *converted* to Chapter 7 on the effective date, then, under § 726(a)(5) the unsecured creditor would be entitled to payment of interest at the legal rate from the date of the Chapter 11 petition.

The Debtor argues that § 726(a)(5) does not really apply in this situation since § 1129(a)(7)(A)(ii) should be read as requiring the impaired non-accepting creditor to receive on the effective date of the plan the amount that it would have received if the Debtor had *filed* Chapter 7 on such date. If the Debtor is right, then § 726(a)(5) would not be a legal basis for requiring interest to be paid during the Chapter 11 case. And this would be the result even though the estate is clearly solvent and able to pay interest. This result makes no sense. The 6th Circuit case cited by the Debtor for this proposition is specifically *not* followed.[1] The better reading of this section is to interpret it to read "If the debtor *converted* his case to Chapter 7 on the effective date of the plan." This clearly allows § 726(a)(5) to relate back to the petition date of the Chapter 11 which results in interest post-Chapter 11 petition date and prior to the effective date of the plan being required to be paid on all claims, including both under- and unsecured, in a solvent estate in order to meet the best interests tests of § 1129(a)(7). Clearly that is the better and more rational interpretation. No justification exists in interpreting § 1129(a)(7) in such a way that would not require interest post-petition in a clearly solvent case. That would be a clear unintended windfall for the Debtor.

So the question becomes what does the term "legal rate" mean as used in § 726(a)(5)? Is it the contract interest rate (perhaps then different for each creditor), or does it mandate that all claims are to be treated the same, i.e. interest at a federal or state judgment rate? Section 726(a)(5) itself provides no clear answer.

■ The Debtor feels that the legal rate of interest should be the federal judgment rate. FCB says it means that it is entitled to its contract interest *at the default rate* since its loan matured pre-petition, it was charging the default rate on the loan pre-petition, and that is its legal rate as man-

---

1. *In re Kentucky Lumber Co.,* 860 F.2d 674, 678 (6th Cir.1988).

dated by 12 U.S.C. § 2205 which governs and regulates interest rates on loans made by Farm Credit system institutions such as FCB. That statute provides that "[i]nterest rates on loans from institutions of the Farm Credit System shall not be subject to any interest rate limitation imposed by any State constitution or statute or other laws." 12 U.S.C. § 2205.

In *In re Cansler* the Land Bank made the same argument that FCB urges here, i.e. that the Farm Credit Act prohibits any rate structure other than that provided for under the Act. The District Court held that the contract rate set forth in § 2205 of the Farm Credit Act was not, as a matter of law, the applicable interest rate. The Court reasoned that the,

> "Bankruptcy Code was not the kind of statute meant to be pre-empted by this provision. The Farm Credit Act gives the Land Bank authority to set its own interest rates according to sound business practices. That does not mean it gives the Land Bank authority to override the Bankruptcy Code. It is much more likely that Congress enacted this statute to avoid conflict with state usury laws. As the Court held in [*In re*] *Neff* [89 B.R. 672 (Bankr.S.D.Ohio)]
>
> > 'Although the statute cited by the Land Bank may protect it from outside direction when it sets interest rates for its loans, that statute does not bind the judicial system in interpreting the legal

standard required for payment of allowed secured claims in a reorganization process. Payment of an allowed secured claim to Land Bank is not a loan ·initiated or agreed to by Land Bank, but rather is an involuntary loan mandated by the bankruptcy laws.'"

*In re Cansler,* 99 B.R. 758, 761 (D.C.W.D.Ky.1989). See also, *In re Case,* 115 B.R. 666 (9th Cir.BAP 1990); *In re Shannon,* 100 B.R. 913 (S.D.Ohio 1989).

This Court agrees with *Cansler* that § 2205 does not mandate the interest rate that must be used by this Court. However, that is not dispositive of the issue. The Court in *Cansler* was dealing with an *insolvent* debtor. The Debtor here is *solvent*.

■ Where a debtor is solvent it is undisputed that unsecured creditors are entitled to interest on their claims.[2] The majority of cases have held that the "legal rate" of interest on those claims is defined under the applicable state law.[3] More recently, several cases (including two by Judge Clark in this District) have interpreted the phrase to mean the federal judgment rate.[4]

In *Matter of Laymon*[5] the Fifth Circuit had to determine the rate of interest to be applied in an analogous § 506(b) situation. There, as here, the legislative history did not refer to a rate of interest. The Court interpreted this silence to mean that Con-

---

**2.** *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 164, 67 S.Ct. 237, 241, 91 L.Ed. 162 (1946); *New York v. Saper,* 336 U.S. 328, 340, 69 S.Ct. 554, 561, 93 L.Ed. 710 (1949); *In re D.C. Sullivan & Co., Inc.,* 929 F.2d 1, 3 (1st Cir.1991); *Debentureholders Protective Committee v. Continental Investment Corp.,* 679 F.2d 264, 269 (1st Cir.1982), *cert. denied sub nom. Glen Corp. v. O.C. Associates,* 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982); *Matter of Beverly Hills Bancorp,* 752 F.2d 1334, 1339 (9th Cir.1984); *Matter of Walsh Construction Co.,* 669 F.2d 1325, 1330 (9th Cir.1982); *United States v. Bass,* 271 F.2d 129, 130 (9th Cir.1959); *Littleton v. Kincaid,* 179 F.2d 848, 852 (4th Cir.1950).

**3.** *Debentureholders Protective Committee v. Continental Investment Corp.,* 679 F.2d 264, 269 (1st Cir.1982), *cert. denied sub nom. Glen Corp. v. O.C. Associates,* 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982); *Matter of Beverly Hills Ban-*

corp, 752 F.2d 1334, 1339 (9th Cir.1984); *In re San Joaquin Estates, Inc.,* 64 B.R. 534 (9th Cir. BAP 1986); *In re Adcom, Inc.,* 89 B.R. 2 (D.C.Mass.1988); *In re A & L Properties,* 96 B.R. 287, 290 (Bankr.S.D.Calif.1988); *In re Boyer,* 90 B.R. 200, 201 (Bankr.S.C.1988); *In re Shaffer Furniture Co.,* 68 B.R. 827 (Bankr.E.D.Pa.1987); *In re John Clay and Co., Inc.,* 43 B.R. 797, 813 (Bankr.Utah 1984).

**4.** *In re Melenyzer,* 143 B.R. 829, 833 (Bankr. W.D.Tex.1992); *In re Godsey,* 134 B.R. 865, 867 (Bankr.M.D.Tenn.1991); *In re Laymon,* 117 B.R. 856, 862 (Bankr.W.D.Tex.1990), *rev'd* on other grounds, 958 F.2d 72 (5th Cir.1992). See, both *Melenyzer* and *Laymon* for an exhaustive review and analysis of case law on § 726(a)(5) by Judge Clark of this District.

**5.** *Matter of Laymon,* 958 F.2d 72 (5th Cir.1992).

gress did not intend a change in pre-Code practice regarding the interest rate to be used. Therefore, the Court resolved the issue by examining and applying pre-Code case law.

Likewise, the legislative history of § 726(a)(5) is silent as to just what is meant by the phrase "legal rate". Applying pre-Code case law, the seminal case in this circuit is *Johnson v. Norris,* 190 F. 459 (5th Cir.1911).

In *Johnson* the Fifth Circuit resolved a dispute between the debtor and his creditors over the distribution of the surplus remaining in a bankruptcy estate after payment to creditors of all principal and interest accruing up until the date of filing. The debtor wanted the balance returned to him. The creditors argued that they were entitled to interest post-petition up to the date of payment with the balance remitted to the debtor.

The Fifth Circuit stated that ordinarily no question would ever arise as to interest subsequently accruing after the date of filing the petition because most estates are insolvent and, thus, by definition are unable to pay creditors even the principal owed them. The solvent estate is the exception to the rule under the Bankruptcy Act that "no interest can be proved or paid except that which has accrued when the petition is filed." Bankruptcy Act of 1898, Section 65(e).

The Fifth Circuit found that,

"... unquestionably, a surplus after paying in full all debts, *including all interest due on the debts accruing before and subsequent to the filing of the petition*, would equitably belong to the bankrupt, and no statute would be needed to authorize the court to direct its payment to the bankrupt." (emphasis added).

*Johnson,* 190 F. at 462.

However, the Act was silent as to whether such post-petition interest was allowable, or whether the surplus must be paid in full to the debtor without paying any such interest.

The Court held that because the Bankruptcy Act was silent it did not control.

Instead, the Fifth Circuit looked to general law and equity. Under the general law the rule was that (1) interest is always given for a delay in payment and, (2) a debtor is required to pay interest up to the time he pays his debt. Equitable principles also required bankrupts to pay interest due by law up to date.

The Court stated,

"[w]hether we are governed by the apparent intention of Congress as shown by the general purpose of the bankruptcy law, or by the general principles of equity, the result would be the same. The bankrupts should pay their debts in full, principal and interest to the time of payment, whenever the assets of their estates are sufficient. The balance then remaining should be returned to the bankrupts."

*Johnson,* 190 F. at 460.

In awarding interest post-petition the Fifth Circuit did not specify the interest rate to be used. However, the Court did say,

"Blackstone states the usual English rule to be that all interest on debts shall cease from the time of issuing the commission, yet, in case of a surplus left after payment of every debt, *such interest shall again revive.*" (emphasis added).

*Johnson,* 190 F. at 465.

It can be extrapolated from this language that the post-petition interest was most likely calculated at the same rate as the pre-petition interest.

In *Johnson* the Fifth Circuit cites with favor, *In re John Osborn's Sons & Co.,* 177 F. 184 (2nd Cir.1910), to support its holding. In *Osborn's* all the debts arose from the purchase of goods. As such, there was no contractual agreement between the debtor and any creditor for the payment of interest. That Court granted post-petition interest at the state judgment rate on the basis that interest, even without an express agreement to pay it, is an incident to the debt and is recoverable as damages for its detention. The Court

found that claims, once filed, were deemed as allowed, unless an objection was received. As allowed claims they were entitled to be treated as judgments, with interest payable at the judgment rate.

Where the claim is secured and the estate is solvent the U.S. Supreme Court has stated,

> "[s]imple interest on secured claims accruing after the petition was filed was denied unless the security was worth more than the sum of principal and interest due.... But where an estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than the debtor." (citation omitted).

*Vanston,* 329 U.S. at 164, 67 S.Ct. at 240. See also, *Coder v. Arts,* 152 F. 943, 950 (8th Cir.1907), affirmed, 213 U.S. 223, 245, 29 S.Ct. 436, 445, 53 L.Ed. 772 (1909); *Sexton v. Dreyfus,* 219 U.S. 339, 345–46, 31 S.Ct. 256, 257–8, 55 L.Ed. 244 (1911). Thus, interest to the secured creditor was awarded at the contract rate in both *Coder* and *Sexton.*

■ The weight of historical case law nationally, as well as in this circuit, is that post-petition interest is payable either at the contract rate, at the statutory rate (if a specialized statute establishes a specialized rate of interest for a particular creditor) or, if there is no applicable statute and no rate was contracted for, at the state judgment rate.[6]

Judge Clark held in *Laymon* and *Melenyzer* that the "legal rate" is the federal judgment rate. As support for his decision

he argues that awarding the federal judgment rate across the board assures a ratable distribution, uses federal law to decide a federal issue, "affords all affected parties a predictable, easily ascertainable, nationally uniform rate and best comports with the analytical posture of claims *vis-a-vis* the federal bankruptcy." *Melenyzer,* 143 B.R. at 833.

Although Judge Clark has done an extensive analysis of this issue and his reasoning is appealing to this Court, the *Johnson* case and the weight of prior case law cited hereinabove convinces this Court that, when there was a prepetition contract between the parties that provided for interest, it is that contract rate which should be applied in situations such as these. Here, therefore, FCB is entitled to interest on its total claim, both under-secured[7] and unsecured, at its contract rate.

■ Now the question becomes, non-default or default contract rate? Pre-petition FCB had accelerated its debt and was charging the default rate. Is there any reason to disturb that situation in a solvent estate? The analysis requires application of the 'balancing of the equities' test which arose in *Vanston.*[8] In *Vanston* the Supreme Court denied the bondholders request for interest on unpaid interest coupons where the bankruptcy court had previously directed the receiver not to pay the coupons. The Supreme Court found that the application of equitable principles could not justify the payment of such interest on interest where the original non-payment occurred by order of the court.

Courts have applied this test in reorganization cases as the basis for considering a

---

6. But see, *In re Beck,* 128 B.R. 571 (Bankr. E.D.Okla.1991), where the Court held that general unsecured creditors who had not contracted for interest or had no statute establishing a specialized rate were entitled to interest at the federal judgment rate.

7. Section 506(b) allows an exception for interest on a oversecured claim even where the estate is insolvent. This Court finds the Fifth Circuit's holding regarding the rate of interest under § 506(b) in *Matter of Laymon* to be inapplicable in this case for two reasons. First, § 506(b) is not germane to this case as the Federal Land

Bank's secured claim is an undersecured one. Secondly, *Laymon* did not deal with the interest rate on a secured claim where the debtor is *solvent.*

8. The U.S. Supreme Court stated this test as,

> "[i]t is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor."

*Vanston,* 329 U.S. at 165, 67 S.Ct. at 241.

readjustment of the interest rates between the debtor and his creditors even where the estate is solvent. See, *D.C. Sullivan,* 929 F.2d at 6 (1st Cir.1991) (balancing of equities did not warrant denying IRS statutory interest it was entitled to under 26 U.S.C. § 6621); *Beck,* 128 B.R. at 573 ("[t]he scale balancing the equities in this matter is overwhelmingly tilted toward restoring the creditor to as near a position as the creditor would have occupied absent bankruptcy before benefitting the Debtors with surplus funds."); *Shaffer,* 68 B.R. at 830 ("we find the equities of the Debtor in this matter close to nil."); *In re Dodge,* 101 B.R. 800, 802 (Bankr.S.D.Fla.1989) (equities do not support allowing unsecured creditors postpetition interest where there would be no surplus returnable to the debtor).

In balancing the equities of this case the Court finds that FCB was the precipitating factor for the filing of this bankruptcy case. Despite the large amount of equity in this estate and the willingness of the Debtor to negotiate a reinstatement of his indebtedness pre-petition, FCB insisted upon full payment of its entire debt which they knew would have required Schoeneberg to liquidate the great majority of his herd and would have put him out of business. That position, taken knowingly, gave the Debtor no choice but to file a Chapter 11 proceeding if he wanted to preserve his business operations. And, that is what the Debtor did. This is one excellent example of why the reorganization laws do exist and how and when they can best be utilized. Although FCB's position was one that it was entitled to take as a matter of *law,* that does not preclude this Court from, as a matter of *equity,* holding that action against them for the purposes of determining the appropriate contract rate to apply post-petition pursuant to the 'balancing of the equities' test. The equities of this case justify a readjustment of the interest rate that FCB was charging pre-petition (default rate) to what it should be allowed to charge post-petition. Therefore, FCB's claim, both its Class 3 secured claim and its Class 9 unsecured claim, shall accrue interest at the non-default contractual rate then in effect under 12 U.S.C. § 2205

for the period of time from the petition date to the effective date of the Debtor's Amended Plan.

## C. *Feasibility—*

FCB also objects to the Debtor's Amended Plan on feasibility grounds. It claims that the Debtor's pro forma projections are not supported by any historical basis or past performance of the Debtor, that cattle markets are currently at a historic high, that there is no margin for error in the projections, and that there is no protection in the event of declining cattle prices. The Debtor, on the other hand, claims that he has not made cash profits in the past because he decided to take cash losses to increase the economic value, size and quality of his cattle herd; that the herd is now at a proper size and quality that he can maintain it at the same size and quality while he sells enough cattle each year to meet the projected cash flow numbers which are based on cattle prices significantly lower than he has been obtaining in the past 12 months for his cattle; that his interest carry on land loans is much more reasonable in relation to his income production than existed pre-petition; that his pre-petition management blunders will not reoccur; and that there are more than adequate protections for FCB under the plan.

Feasibility is an issue that calls for the exercise of judicial discretion. The Code at § 1129(a)(11) requires that the Court find that the plan is not likely to be followed by liquidation or the need for further reorganization. One way of stating the legal standard is that the Court must decide whether it is more probable than not that the Debtor will meet or beat his projections.

FCB argues this is really a liquidation plan. After all, most of the real estate is either going back to the secured creditors for agreed upon credits or will be sold a year or so after the plan, and the plan is dependent on cattle sales to fund payments. However, two tracts of land will be retained and the debt thereon paid out under the plan. And they will be used in the

Debtor's business operations. And, to be sure, all payments under the plan will come from liquidation of cattle. However, the liquidation of cattle proposed by the Debtor is not a liquidation of his herd. To the contrary, the plan is based on the assumption that herd size and quality will remain the same. Clearly sale of cattle will occur; but only as part of an ongoing cattle operation. Liquidation (in the bankruptcy sense of the word) of the herd is not anticipated; maintenance of the herd at a steady size and quality with liquidation of the calves produced from that herd on a yearly basis as well as those cows and bulls culled from the herd on a yearly basis is what the plan provides.

■ The proper inquiry is whether, from a preponderance of the evidence, it is more probable than not that Mr. Schoeneberg will be able to meet his projections. The Court feels that he will. The Court is not bound to blindly look at past performance without taking into consideration the reasons for that past performance. Mr. Schoeneberg's explanations as to the reasons for his rather large losses over the prior years of operation are entirely rational. A good portion of his cash losses are now found in the value, size and quality of his cattle herd (the herd has had a very real economic gain). He knowingly took some of those losses. Other losses are attributable to excessively large interest carry (not so under the plan) and improper management decisions the Debtor made during the drought in the late 1980's, something as to which Mr. Schoeneberg says he has learned his lesson and that they will not that to occur again. The Court believes him.

FCB has also tried to make great moment of the fact that Mr. Schoeneberg's income projections were determined by simply taking the amount of annual cattle sales that would be necessary to produce the revenue to make the payments under the plan and dividing them roughly into 12 monthly amounts. In fact, the Debtor adequately explained that he would sell the amount of cattle necessary each month to produce the amount of money needed to pay the expenses of operation and the debt service required by the plan each month. The fact is that the number of cattle sales shown on the projections to be required on an annual basis is sufficient at the prices assumed both to generate enough income to fully pay all expenses of operation and all debt service under the plan and to leave more than enough for Mr. Schoeneberg and his family to live on while maintaining herd quality and size at the same time. The prices used for the cattle sales appeared reasonably moderate. Mr. Schoeneberg time and again assured the Court that he would sell the cattle during the year in accordance with the disbursement requirements of his business and the plan. And, as noted above at the moderate prices assumed, the total number of sales required on an annual basis to fund all of that year's plan obligations and operating expenses will most likely result in Mr. Schoeneberg's herd maintaining its same relative size and quality. As Mr. Schoeneberg pointed out, from month to month based upon the sales requirements under the plan there may be a variation in herd size, but from year to year there should not any significant variation.

Further, it should be remembered that the plan provides that if the herd size reaches a size as low as 400 head (bulls and cows only), a default automatically occurs; and that is even though the plan payments may be current and it is without regard to the amount of FCB debt at the time. Mr. Schoeneberg testified that if the herd size reached that low a number it would most likely consist solely of pure bred cattle since the commercial cattle would be the first to go. 400 head of Mr. Schoeneberg's pure bred cattle at an average price of only $1500.00 a head is $600,000.00 which leaves a substantial cushion in excess over the debt to be paid from those cattle under the plan. It is more probable than not that payment of creditors will occur under the Debtor's plan.

With the large amount of equity in excess of the unsecured debt, it is simply not reasonable to require Mr. Schoeneberg to liquidate his herd at this time and go out of business when his plan provides both a

reasonable probability for success, full payment of all creditors at a market rate of interest, and full and complete protection in the event the payments are not made or the herd size is not maintained. The plan is feasible within the meaning of § 1129(a)(11). It is reasonably probable that the Debtor can do what he proposes and the plan provides adequate means for its implementation.

### D. *The Secured Claim—Cram Down.*

■ Now for cram down. With regard to the FCB's secured claim the parties have agreed the value of the real estate serving as collateral is $325,000.00. The plan provides that FCB will be paid that amount of money over 20 years at the prevailing FCB rate of interest as determined in accordance with the federal statutes which govern FCB. It is extremely difficult to understand how an argument can even be made that such treatment is not fair and equitable treatment within the meaning of 1129(b)(2)(A)(i)(I) and (II). The Court concludes that it is fair and equitable treatment. Of course, the post-petition, pre-confirmation interest on this amount at the rate as previously determined will have to be added to this number to reach the total amount for this under-secured claim.

### E. *The Unsecured Claim—Cram Down.*

■ With regard to the unsecured claim, § 1129(b)(2)(B)(i) provides that, to be crammed down, FCB must receive property of a value as of the effective date of the plan equal to the allowed amount of the claim. The plan provides for payment of the claim with interest at the rate set by FCB from time to time in accordance with the federal law governing it. Clearly this is not reasonably objectionable.

The real thrust of FCB's § 1129(b)(2)(B) objection is that the plan stretches the payments over a 20 year amortization. And that is simply too long. FCB cites *Matter of D & F Construction, Inc.*, 865 F.2d 673 (5th Cir.1989) as its authority.

The Fifth Circuit has told us that the determination of whether a particular creditor's treatment is 'fair and equitable' is determined by "consider[ing] the entire plan in the context of the rights of creditors under state law and the particular facts and circumstances ...". *D & F Construction*, 865 F.2d at 675.

In *D & F Construction* the Fifth Circuit held that the Debtor's proposed plan of reorganization was not "fair and equitable", although it technically met the requirements of § 1129(b)(2), where it negatively amortized the secured creditor's claim for twelve years, deferred substantially all repayment of principal for fifteen years, and denied the creditor the right to foreclose on its collateral during that time.

While this arrangement was entirely acceptable to the debtor and the other creditors who were all hoping that the local real estate market would improve over the duration of the plan, the Fifth Circuit found that such speculation was impermissible as to the impaired secured creditor. Not only was all risk of loss being foisted on its back; it was also being denied access to the security it had contracted for and was effectively being required to fund the project for the benefit of other creditors and the debtor. In the context of the entire plan, the rights of creditors under state law, and the facts and circumstances of the case, the Fifth Circuit concluded such treatment not to be "fair and equitable".

The situation at hand bears little relation to that encountered in *D & F Construction*. Here we are dealing with what is fair and equitable with regard to an unsecured creditor's claim. The unsecured creditor involved is being paid interest on its unsecured claim at the rate of interest proscribed for it by 12 U.S.C. § 2205 as that may fluctuate from time to time. The unsecured creditor's claim is being collateralized with collateral of a value of approximately three times the amount of the indebtedness. Reasonable default provisions to protect, if not insure, payment of this unsecured creditor's claim have been included in the plan. These provisions have the effect of retaining the risk of loss on the Debtor. There is no negative amortization of the claim as was the primary objection in *D & F Construction*. The only

factor to which FCB points which, when considered in a vacuum, could be considered to breach the fair and equitable test of § 1129(b)(2)(B) is that the payments are scheduled to be amortized and paid over a 20–year period of time. However, one single factor cannot be viewed in a vacuum in accordance with the Fifth Circuit's directive in *D & F Construction*. "[T]he entire plan in the context of the rights of creditors under state law and the particular facts and circumstances ..." must be considered. *D & F Construction*, 865 F.2d at 675. Under the present circumstances, absent bankruptcy, FCB would be required to institute litigation on its claim, receive a judgment thereon, and undertake the appropriate post-judgment extraordinary remedies in order to realize on its claim. Here, it is receiving a payment package which is fully secured, provides a market rate of interest, is properly documented, and includes appropriate default provisions. The fact that the payment period is over twenty years does not make this plan per se unfair or inequitable as to the unsecured claim of FCB. To the contrary, the provisions for the treatment of FCB's unsecured claim fall well within the acceptable allowance of what is fair and equitable under the particular circumstances of this case.

### Conclusion

The classification scheme with regard to the unsecured creditors in this plan does not run afoul the Fifth Circuit's *Greystone* opinion. Interest on both FCB's undersecured Class 3 claim and its unsecured Class 9 claim shall accrue at the applicable non-default contractual rate from the petition date to the effective date of the plan. The plan is feasible as it is not likely to be followed by the need for liquidation or further reorganization. The plan is fair and equitable both as to the undersecured claim of FCB and its resulting unsecured deficiency claim. Accordingly, the plan will be confirmed.

An Order of even date herewith has been entered confirming the plan.